UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRANK EMERSON and MARIA EMERSON, by her guardian ad litem, FRANK EMERSON

Plaintiffs,

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,

Defendant.

No. C 23-02158 WHA

**ORDER RE MOTION FOR PARTIAL SUMMARY JUDGMENT**

## INTRODUCTION

In this denial-of-coverage case, the insurer concedes that a reasonable jury could conclude the insurer breached its policy. Because a reasonable jury could also conclude that the insurer did so in bad faith, the insurer's motion for partial summary judgment as to that issue (and punitive damages) must be rejected. That said, the insurer's motion for partial summary judgment as to the insured's husband's emotional distress claim is granted.

## STATEMENT

These facts are undisputed except where stated:

**1. THE LONG-TERM CARE INSURANCE POLICY.**

The insured's husband, Frank Emerson, for decades sold policies for Prudential Insurance Company of America (Dkt. No. 51 ("Emerson Decl.") ¶ 4). In 2002, he bought one for himself and one for his wife, Maria Emerson, the insured here (*id.* ¶ 5). Under these long-term care policies, if the insured began to suffer from certain conditions, the insurer would

cover certain care needed to live with them (*see, e.g.*, Dkt. No. 52-1 Exh. 56 ("Guidelines") 4). Mrs. Emerson's policy had certain optional benefits and eligibility criteria, as follows:

Mrs. Emerson's premiums accounted for *her age*: After the policy's immediate effective date, so long as she suffered from qualifying conditions, it promised to pay benefits regardless of her relative youth when such conditions befell her (*see* Dkt. No. 46-2 Exh. 1 ("Policy") 17).

Similarly, Mrs. Emerson paid more upfront for the *option of cash benefits later*: So long as she suffered from qualifying conditions, the policy promised to pay her cash even if she did not "incur charges and submit a bill" (*see* Policy: Cash Benefit Rider 1). This came at extra cost and would ease care management in the home and from varied providers (Guidelines 126).

As for the *qualifying conditions*, the policy defined two triggers: loss of ability to perform activities of daily living and cognitive impairments threatening health and safety:

> In order to receive benefits you must FIRST be assessed by an Assessor and confirmed as having a Chronic Illness or Disability. A Chronic Illness or Disability is one in which there is:
> (1) *A loss of the ability to perform*, without Substantial Assistance, at least two Activities of Daily Living. This loss must be expected to continue for at least 90 consecutive days. Activities of Daily Living are: Bathing, Continence, Dressing, Eating, Toileting, and Transferring; or
> (2) *A severe Cognitive Impairment*, which requires Substantial Supervision to protect you from threats to health and safety.

(Policy 11 (emphases added)).

The *first* trigger's "loss of the ability to perform" was not expressly defined in the policy. "Substantial Assistance" was defined as either the "physical assistance" or the "constant presence of another person within arm's reach that is necessary to prevent, by physical intervention, injury to you while you are performing an Activity of Daily Living" (*id.* at 8). All agree that the caretaker's active or standby assistance had to be physical to qualify (like "holding the person and bathing them," to use Prudential's example (Tr. 34)). But Prudential further contends that the insured's "loss of the ability to perform" itself had to stem from a physical condition (not from a mental one) (*see ibid.*).

The *second* trigger's "severe Cognitive Impairment" was not fully defined, either. "[S]evere" was undefined. And "Cognitive Impairment" was defined as follows:

> A loss or deterioration in intellectual capacity that is:
> (1) Comparable to and includes Alzheimer's disease and similar forms of irreversible dementia;
> (2) Measured by clinical evidence and standardized tests that reliably measure impairment in the individual's:
>     (a) short-term or long[-]term memory;
>     (b) orientation as to people, places, or time and
>     (c) deductive or abstract reasoning.

(Policy 5). The parties disagree, however, as to how "severe" an impairment had to be to qualify. And, Prudential contends that the insured's "cognitive impairment" had to emerge from a neurological problem (not a psychiatric one). "Substantial Supervision" was defined as "[c]ontinual oversight that may include cueing by verbal prompting, gestures, or other demonstrations by another person, and which is necessary to protect you from threats to your health or safety" (*see id.* at 8).

At oral argument, Prudential conceded that while the limitations could be read in the way Prudential favors, they could also be read against the way Prudential favors: The policy, the insurer said, "doesn't exclude [an underlying psychiatric condition], but it does not cover it" (Tr. 34).

Finally, as to whether the policy's terms incorporated outside meanings that could clear away ambiguity, all agree that the policy was based on provisions in the tax code. The policy itself stated it "*intended* to be a federally [tax-]qualified Long Term care insurance contract" (Policy 1, 20 (emphasis added)). The policy's terms, however, did not perfectly parrot the tax code (*compare, e.g.*, 26 U.S.C. § 7702B(c)(2)(A) (2002) (defining "chronically ill individual" with three triggers), *with* Policy at 11 (defining "chronic illness" with two triggers)). And, the policy made clear that its terms governed except where "[p]ublic guidance issued by the Internal Revenue Service or Treasury Department [provides] that a provision of this Policy does not comply with the requirements of Code Section 7702B" (*see* Policy 20). No party points to specific guidance from a tax authority stating that any provision of this policy was or is noncompliant. And, Prudential, which at first said the statute further limited the policy's terms, now says the parties are "stuck with the wording of the policy" (*see* Tr. 33).

3

For this order, while each side asserts conflicting views of what Mrs. Emerson's policy in fact meant, the immediate question is whether Prudential's reading of the policy was so distorted as to constitute bad faith.

2. **THE BENEFITS APPROVED AND DENIED UNDER THE POLICY.**

A. **2012–2019: MRS. EMERSON'S BENEFITS APPROVED.**

Starting in 2012, Mrs. Emerson submitted claims against her policy (*see* Emerson Decl. ¶¶ 7–10). Between 2012 and 2019, Prudential annually reassessed her and awarded the relatively youthful Mrs. Emerson cash benefits based on her cognitive impairments (*see ibid.*; Dkt. No. 46-2 ¶¶ 7–9). The parties now dispute whether Mrs. Emerson ever even qualified under the cognitive-impairment prong. And, they dispute whether she ever even submitted claims seeking approval under the activities-of-daily living prong, or qualified under it, or could be denied benefits because she submitted claims intending to show one trigger when they in fact showed the other. (Her 2015 assessment, for instance, revealed "a need for ADL assistance related to a cognitive impairment" (*see* Dkt. No. 52 Exh. 38 at -2599).)

Those disputes are only indirectly at issue in this action, however: Mrs. Emerson's medical history may bear on her later medical condition, and Prudential's past claim processing may inform whether its later claim processing was in bad faith, for instance. But the suit contests only the 2020 reassessment that ended in her claim being denied in 2021.

B. **2020: MRS. EMERSON'S BENEFITS DENIED.**

In 2019, Prudential launched an initiative focused on "fraud, waste, and abuse" in long-term care policies like those the Emersons had bought, which Prudential long ago had decided to stop issuing (*see, e.g.*, Dkt. No. 52 Exh. 26 at 40–41; Dkt. No. 52 Exh. 28 at 44–46).

In April 2020, Prudential staff involved in its anti-fraud initiative flagged Mrs. Emerson's policy for deeper review for three underlying reasons all agree on: Her age, her cash benefits, and her home care (*see* Br. 6 n.10; Opp. 8 n.6). Prudential further contends that one of its flags concerned not merely that she was receiving cash benefits and home care but that untracked expenses in a home setting were out-of-step with her stated needs, whereas Mrs. Emerson contends this was a sham rationale, as it was never asserted in past reviews, was not supported

4

by personalized annotations at the time, and not consistent with the next steps taken (*cf.* Br. 6 n.10; *see* Dkt. No. 52-1 Exh. 72 ("Spreadsheet"); Dkt. No. 46-1 Exh. E 112–14 (testifying to spreadsheet notes and next steps)). In short, Prudential says it flagged predictors of fraud, waste, and abuse (Br. 5–6), whereas Mrs. Emerson contends it flagged the exact benefits of the bargain struck, predictors only of Prudential's unwanted costs (Opp. 8 & n.6; Tr. 22–23).

Around October 2020, and for the first time since her claim was flagged, Mrs. Emerson's annual reassessment began (*see* Dkt. No. 46-2 ¶ 4; Dkt. No. 46-3 Exh. 10 at -5974). Prudential's third-party claim administrator, CHCS, Inc., saw a "priority" flag in their jointly accessible claims system (*see, e.g.*, Dkt. No. 52 Exh. 25 at 79–80; Dkt. No. 52 Exh. 23 at 142–44; Dkt. No. 46-3 ¶ 4). All agree that the ensuing review was unlike any Mrs. Emerson had experienced before. Prudential contends its fraud team did not influence the investigation nor its outcome, and that the process simply reflected renewed but reasonable rigor; Mrs. Emerson contends the fraud team pushed the CHCS investigation towards just one conclusion — denial — with disregard for her conditions and policy (*see* Opp. 9–14).

The investigative timeline was as follows:

- In November 2020, *CHCS asked Prudential's fraud team* whether to ask Mrs. Emerson's psychiatrist to complete a more thorough benefits-eligibility assessment, or instead to have CHCS's bariatrics-trained medical director review the file without that information; the fraud team advised immediate review (*see, e.g.*, Dkt. No. 46-3 Exh. 10 at -5973; Dkt. No. 52 Exh. 23 at 131–32; Spreadsheet 2; Opp. 9–10 & nn.7–8 (collecting cites));

- In December 2020, *CHCS's medical director, Dr. John Nye,* concluded from her file that Mrs. Emerson was not eligible because she *(1)* could perform activities of daily living, disagreeing with her examining physician, and *(2)* lacked a "neuro-cognitive" disorder, deviating from policy language (*compare* Dkt. No. 46-2 Exh. 5 ("Nye Reports") -1257–58, *with* Dkt. No. 52 Exh. 35 at -1233–34, *and* Policy 5, 11; *see also* Opp. 10);

- In January 2021, *CHCS tasked Dr. Nye with a second review* of her file; Dr. Nye newly concluded Mrs. Emerson was not eligible because, again deviating from policy language, *(1)* her "inability to perform" activities of daily living was "psychiatric-based," not "*functional*," and *(2)* she required "substantial supervision" due only to a "psychiatric issue," not "a *neuro*cognitive impairment" (*see* Nye Reports -1364–65; *see also* Opp. 10–11);

- In February 2021, *CHCS hired and instructed Dr. David Yuppa*

- *(through a third-party network)* to review *(1)* just *four* of six activities of daily living for "loss of *functional* capacity" and *(2)* cognitive conditions, emphasizing "*neuro*cognitive" as opposed to "psychiatric" conditions (Dkt. No. 46-3 Exh. 12 at -6605–07); even with such instruction, Dr. Yuppa concluded that *(1)* Mrs. Emerson *did* have issues performing *three* activities of daily living (Dkt. No. 46-3 Exh. 13 at -1390–92), but *(2)* did not have a severe cognitive impairment (*see id.* at -1390; *see also* Opp. 11–12);

- Regardless, on February 25, 2021, the same day Prudential and CHCS held a "discussion," *Prudential drafted a four-page denial letter* by 10:35 a.m. in the morning, and then CHCS's *Dr. Nye conducted in the afternoon his third review, again denying coverage*; Dr. Nye dismissed Dr. Yuppa's findings by sating "there have been no medical records which indicate dysfunction of the arms or lower extremities" (*see* Dkt. No. 52-1 Exhs. 65–66 (re discussions); Dkt. No. 52-1 Exh. 77 at -3553–57 (draft denial); Nye Reports at -1398);

- In March 2021, *Prudential conferred with counsel* (*see* Dkt. No. 52-1 Exh. 90), then *hired a surveillance team* that showed Mrs. Emerson stayed home except to "travel[] to a medical dental building" with "her husband" driving (Dkt. No. 52-1 Exh. 79 at -6619; *see also* Dkt. No. 46-1 Exh. E at 86–88);

- In May 2021, *CHCS hired and instructed Dr. Maya Yustis (through a third-party network)* to look for, like Dr. Yuppa, "a loss of *functional capacity* OR . . . severe cognitive impairment" (Dkt. No. 52-1 Exh. 81 at -6639); Dr. Yustis reported in August 2021 that *(1)* her "[r]eview of records more likely than not supported a *psychiatrically*-based inability (anxiety, psychosis, depression) to perform ADLs," while *(2)* her testing "results were more likely than not *invalid* in describing [Mrs. Emerson's] overall cognitive functioning level and its impact on functional limitations" (Dkt. No. 46-3 Exh. 16 at -1799, 1802 (emphases added); *see also* Dkt. No. 52 Exh. 27 at 91–93, 115; Opp. 13);

- In September 2021, *Prudential's fraud team discussed Dr. Yustis's "peculiar" report* (Dkt. No. 52 Exh. 23 at 239–40), then drafted "language to be used" to deny benefits (*id.* at 244–45; *see* Dkt. No. 52 Exh. 68 at -7360; Opp. 14).

Finally, in October 2021, Prudential's fraud team instructed its claims administrator, CHCS: "We drafted a potential closing letter that can be used. If the review disagrees with what is proposed in the letter, please let us know as soon as possible and we can set up time t[o] discuss further" (Dkt. No. 52-1 Exh. 70 at -7375). It attached the letter (*see ibid.*). After CHCS's review, Prudential reattached its denial letter and reiterated, "Please advise if you are in agreement, or let me know if you have any issues or changes" (*id.* at -7374; *see also* Dkt. No. 52 Exh. 23 at 246–47, 251). This was the denial letter that CHCS then sent — entirely

unchanged except for its date — to Mrs. Emerson to reject coverage for her claims (*see* Dkt. No. 46-2 Exh. 7 at -1651–53).

From the first CHCS email in the record to final denial, the process lasted one year to the day (*compare ibid.*, *with* Dkt. No. 46-3 Exh. 10 at -5974).

In 2023, the Emersons sued in state court for breach of contract, bad-faith denial of contract benefits, and emotional distress (Dkt. No. 1). Prudential removed for diversity, then answered (Dkt. Nos. 1, 13). With trial approaching, Prudential now moves for partial summary judgment on all claims in the case except breach of contract.

## ANALYSIS

### 1.   THE MOTION AS TO BAD-FAITH DENIAL OF BENEFITS.

Prudential first moves for summary judgment on Mrs. Emerson's tort claim that it denied her policy benefits in bad faith, on Mr. Emerson's parallel tort claim, and thus on any chance for punitive damages.

#### A.   MRS. EMERSON'S CLAIM.

At trial, Mrs. Emerson ultimately must show that "(1) benefits due under the [insurance] policy were withheld; *and* [that] (2) the reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001) (citing *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990)) (emphasis added).

For this motion, however, Prudential must only show that one of those prongs cannot be met, *see Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000), and here Prudential is further limited to showing only that the second prong cannot be met (unreasonable denial). That limitation is required because Prudential *does not move* for summary judgment on breach of contract, which underlays the first prong (benefits due) (Br. 1 n.1; Reply 8 n.5). This order thus must construe that disputed issue, which entails material facts, to favor the non-moving party for now. *See, e.g.*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Prudential sometimes says as much (*see, e.g.*, Br. 17; Tr. 3–4). Especially on reply, however, it slips into contending the contract and/or medical conditions wholly preclude Mrs. Emerson from recovering benefits, citing cases from different

7

postures (*e.g.*, Reply 1, 2–4 (citing, e.g., *Benavides v. State Farm Gen. Ins. Co.*, 136 Cal. App. 4th 1241, 1252 (2006) (policy did not cover loss, precluding bad-faith denial); *GGIS Ins. Servs. Inc. v. Superior Ct.*, 168 Cal. App. 4th 1493, 1508 (2008) (similar); *Hackethal v. Nat'l Cas. Co.*, 189 Cal. App. 3d 1102, 1111 (1987) (similar)). This order ignores those contentions, except as they inform the second prong, reasonableness.

Here, based on the record, a reasonable jury could find in favor of Mrs. Emerson that Prudential denied her 2020 claim in bad faith, as follows: Prudential reported large losses from its long-term care policies and, in 2019, launched a "fraud, waste, and abuse" initiative focused on them (*see, e.g.*, Dkt. No. 52 Exh. 26 at 39–41; Dkt. No. 52 Exh. 28 at 44–46). That team flagged Mrs. Emerson's claim because she received cash payments, despite her youth, while being cared for at home, which were all contracted-for benefits of the bargain (*compare, e.g.*, Spreadsheet 6, *and* Dkt. No. 46-1 Exh. E 112–14, *with* Policy 17, *and* Policy: Cash Benefit Rider 1)). Prudential did not find fraud and never referred her file to its corporate-level fraud department nor to law enforcement (Br. 6 n.9 (conceding and citing records)). Instead, Prudential found Mrs. Emerson suffered real impairments of some kind (*e.g.*, Br. 18; Dkt. No. 46-2 Exh. 7 at -1652). But, a reasonable jury could find, it took steps to avoid paying for them: *First*, Prudential alerted its third-party claim administrator that the file was a "priority" for review and involved itself in that review, periodically drafting denial letters (*see, e.g.*, Dkt. No. 46-1 Exh. E 17–18, 191). *Second*, Prudential (through its claims administrator) hired doctors and influenced them to assess Mrs. Emerson's medical conditions as ineligible and, even worse, did so using criteria not in the policy (*compare, e.g.*, Policy 11, *with, e.g.*, Dkt. No. 46-3 Exh. 12 at -6605 ("a loss of functional capacity")). Still, even these doctors said she met qualifying conditions or said their own testing results were not "valid" (*e.g.*, Dkt. No. 46-3 Exh. 13 at -1390–92; Dkt. No. 46-3 Exh. 16 at -1799). *Finally*, when Prudential still did not have the answer it wanted as the one-year anniversary of the investigation's start approached, Prudential's fraud team drafted a denial letter and sent it to the claims administrator, and it was adopted (*see* Dkt. No. 52-1 Exh. 70 at -7374). The claims administrator then sent the same letter to Mrs. Emerson (*compare id.* at -7376–78, *with* Dkt. No. 46-2 Exh. 7 at -1651–53).

Prudential makes three main arguments, none persuasive:

*First*, Prudential argues that its investigation was full and fair as a matter of law. No one disputes the review went on for one year. The question is why, and a jury could find that the fraud team kept repeating and repeating reviews until it got the one result it wanted. *See Tomaselli v. Transam. Ins. Co.*, 25 Cal. App. 4th 1269, 1281 (1994). Prudential contends there is no "causal link" between Prudential's fraud team and the claim's denial (*see* Reply 5–6, 12–13; Tr. 9–10). It cites a case where a court found no link: *Cardiner v. Provident Life & Accident Ins. Co.*, 158 F. Supp. 2d 1088 (C.D. Cal. 2001) (Judge Dickran M. Tevrizian, Jr.). There, the insurer also had a business plan to cut payouts. But the payout in question was cut without any participation from a fraud team and not until four years after the plan was generally adopted. *Id.* at 1097, 1105–06. The district judge thus comfortably ruled as a matter of law that there was no link. *Id.* at 1105–06. Here, this order cannot do the same because of what a reasonable jury could find: The Prudential team was proximate in time and process, and played a direct role. Prudential spun up its new team to find claimants receiving benefits to deny now (*see, e.g.*, Dkt. No. 46-3 ¶ 3). The team then started or intensified the investigation into Mrs. Emerson by flagging her file (*supra*). And the team ended that investigation by attaching a "[p]roposed closing letter" and asking its claims administrator to "[p]lease advise if you are in agreement" (*see, e.g.*, Dkt. No. 52-1 Exh. 70 at -7374–75). A jury could thus find a causal link and conclude from these circumstances that Prudential's investigation was not "full, fair[,] and thorough." *See Bosetti v. U.S. Life Ins. Co. in N.Y.C.*, 175 Cal. App. 4th 1208, 1236–37 (2009); *see also Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 723, 724 n.7 (2007). Such a finding of bias in the investigation would suffice for finding bad faith in the denial. *See also Guebara*, 237 F.3d at 996. Even if Prudential were right that no reasonable jury could find its investigation unbiased (it's not), it would not be in the clear:

*Second*, Prudential further argues that its policy interpretation was also reasonable as a matter of law, namely because Prudential did not "interpret" its policy at all: Prudential says that "the Policy coverage language itself[ was] the only relevant language for each expert to consider from an eligibility perspective" (*ibid.*). And Prudential says that it sent this policy

9

language to the doctors (*ibid.*), then relied upon only the doctors' determinations made using that "definitive" language to deny Mrs. Emerson her claims (*see* Tr. 38; Br. 16–17; *see also* Reply 14 n.9 ("The Policy language controls, not the claims guidelines/matrix.")).

But this argument itself raises factual questions appropriate for resolution at trial. Record evidence supports that Prudential *paraphrased* the policy, excerpted the policy, and supplemented the policy with new distinguishing terms not in the policy: For example, when Prudential provided instructions for medical experts, record evidence supports that Prudential did not quote the policy's two "definitive" triggering conditions in full — nor did Prudential quote from its existing interpretative guidelines or forego legalese in favor of something else. Rather, a reasonable jury could find, Prudential instructed doctors to assess whether "the insured need[s] substantial assistance with at least two Activities of Daily Living (ADLs) *due to a loss of functional capacity*," using words *not in the policy* (Dkt. No. 46-3 Exh. 12 at -6605 (emphasis added)). Similarly, as to the second trigger, a jury could find Prudential did not include the complete policy language in its referral letter, then editorialized what language it did include:

> [T]he insured has [been diagnosed by a doctor as having] a severe *psychiatric* and cognitive disorder that causes her to be permanently disabled and requiring 24/7 supervision. While Ms. Emerson may have a *psychiatric* condition, it's unclear if her condition meets the severe cognitive impairment that is covered in the LTC policy. Other records on file . . . are not as clear regarding a *neuro*cognitive condition.

(*see* Dkt. No. 46-3 Exh. 12 at -6606 (emphases added); *see also* Dkt. No. 46-3 Exh. 15 (other referral letter)). Again, it did so using words *not in the policy*. Furthermore, a reasonable jury could find that these instructions resulted in conclusions that would not have been formed otherwise. Record evidence supports that doctors parroted back Prudential's non-policy language in key findings, such as: "Review of records more likely than not supported a *psychiatrically-based* inability (anxiety, psychosis, depression) to perform ADLs without evidence of a *neuro*cognitive impairment such as dementia and/or *functional* impairment" (Dkt. No. 46-3 Exh. 16 at -1802).

If Prudential's policy language was *clear*, why deviate from it? Or, if Prudential's policy language was *unclear*, why deviate also from Prudential's own eligibility guidelines? A jury could instead conclude Prudential made a bad underwriting decision in selling the policies, eventually realized it, ginned up slick new interpretations, and used them to go back on its word and deny benefits.

*Finally*, Prudential says "So what?": It can prevail on a bad-faith denial claim even if it intended to deny Mrs. Emerson benefits, so long as it denied her by choosing a reasonable policy interpretation amidst a genuine coverage dispute (*see* Br. 17–18). To repeat, Prudential engages in a contingency, namely, if its interpretation was wrong, it was not so wrong as to be bad faith. Experience has taught this district judge that a contingent argument like this is best evaluated on a full trial record and not in a vacuum, especially when its "interpretation" is such a messy hodge-podge.

Prudential's remaining arguments are contradicted by the insurer's concessions in this posture and can be ignored: Prudential says there is "no evidence" that Mrs. Emerson meets a trigger (*see, e.g.*, Tr. 5). But as the insurer said in court, "Prudential did not move for summary judgment against Mrs. Emerson's claim for breach of contract because we recognize that there is a genuine dispute" on the medical evidence (*id.* at 3).

A reasonable jury could find Prudential denied Mrs. Emerson's benefits in bad faith. Perhaps not all juries will so find, but that is not the standard to survive. Prudential's motion for summary judgement on Mrs. Emerson's claim of bad-faith denial of benefits is **DENIED.**

### B. PUNITIVE DAMAGES.

Prudential also moves for summary judgment to reject the prayer for punitive damages resulting from bad-faith denial (Br. 20). "[B]ad faith does not necessarily indicate the presence of malice, oppression or fraud. 'There must be substantial evidence of intent to vex, injure and annoy, a conscious disregard of plaintiff's rights, before punitive damages may be awarded.'" *Tibbs v. Great Am. Ins. Co.*, 755 F.2d 1370, 1375 (9th Cir. 1985) (citation omitted) (quoting *Betts v. Allstate Ins. Co.,* 154 Cal. App. 3d 688, 709 (1984)).

1    For the reasons set forth above, a reasonable jury could find not only bad faith but also
2    the requirements for punitives.  This motion is **DENIED**.

### C.  MR. EMERSON'S CLAIM.

Finally, in a footnote, Prudential sought to extend its motion for summary judgment on bad-faith denial of benefits to reach Mr. Emerson's parallel claim for bad-faith denial of benefits (Br. 19 n.12).  Prudential's footnote did not proffer enough respecting Mr. Emerson's variant of this claim to merit response.  *See Nissan Fire*, 210 F.3d at 1102–03.  Prudential conceded as much when it filed a follow-on motion directed to the same subject (Dkt. No. 59).  Thus, to the extent Prudential here moved for summary judgment as to this issue, the motion is **DENIED AS MOOT**.

### 2.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Prudential separately moves for summary judgment as to Mr. Emerson's claim that Prudential intentionally inflicted emotional distress upon him (Br. 19).  Only Mr. Emerson brought this claim (Compl. ¶¶ 40–44).  At trial, Mr. Emerson will have to show that (1) Prudential did outrageous acts (2) with at least reckless disregard for Mr. Emerson's emotional distress that (3) actually and proximately caused (4) Mr. Emerson to suffer severe emotional distress.  *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004).

For this motion, Prudential does not challenge that its conduct caused Mr. Emerson severe emotional distress (*see* Br. 19).  Instead, Prudential argues that it acted reasonably, and so could not have acted outrageously (or recklessly) (*see ibid.*).  But a jury *could find* Prudential acted unreasonably (*supra*).  Still, Prudential's larger point about what the record supports is well-taken (*cf.* Br. 19).  And, Prudential next argues that even assuming its denial were unreasonable, this would be far from sufficient to establish outrageous conduct under California law:  Insurance denials rarely, if ever, can form the basis for emotional distress claims (*see ibid.* (citing *Coleman v. Rep. Indem. Ins. Co.*, 132 Cal. App. 4th 403, 417 (2005))).

In what is effectively a one-sentence opposition, Mr. Emerson asserts only that the law says the opposite of what Prudential says, citing only the same case (Opp. 20:2–4 (citing *Coleman*, 132 Cal. App. 4th at 417)).  (Mr. Emerson in the same paragraph cites another

decision, but that decision addresses different issues (*ibid.* (citing *Anderson v. State Farm Mut. Auto. Ins. Co.*, No. 2:06-cv-2843-JAM-KJM, 2008 WL 2441086, at *1 (E.D. Cal. June 13, 2008) (Judge John A. Mendez))).). When asked to elaborate at oral argument, counsel for Mr. Emerson responded only by referring the Court to "[t]he case law cited in our opposition" (Tr. 3). That case supports Prudential. *See Coleman*, 132 App. 4th at 417; *see also Schlauch v. Hartford Accident & Indem. Co.*, 146 Cal. App. 3d 926, 936 (1983); *cf. Beckham v. Safeco Ins. Co. of Am.*, 691 F.2d 898, 904 (9th Cir. 1982).

As a result, although both sides make abbreviated arguments, Prudential carries its initial burden, and Mr. Emerson points to nothing in return. The motion for summary judgment as to Mr. Emerson's claim for intentional infliction of emotional distress is thus **GRANTED.**

## CONCLUSION

Prudential's motion for summary judgment is thus **GRANTED IN PART AND DENIED IN PART.** As to Mrs. Emerson's claim for bad-faith denial of benefits and prayer for punitive damages, the motion is **DENIED.** As to Mr. Emerson's parallel bad-faith denial claim and punitive damages, the motion is **DENIED AS MOOT**, given the superseding motion. Those claims survive for now. As to Mr. Emerson's intentional infliction of emotional distress claim, however, the motion is **GRANTED.** That claim is out of the case.

**IT IS SO ORDERED.**

Dated: September 27, 2024.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE