1   ANDREW AZARMI (SBN 241407)
    andrew.azarmi@dentons.com
2   SEENA FOROUZAN (SBN 317777)
    seena.forouzan@dentons.com
3   SAMUEL D. JUBELIRER (SBN 287649)
    samuel.jubelirer@dentons.com
4   ALEXANDER PADUA (SBN 327433)
    alexander.padua@dentons.com
5   DENTONS US LLP
    1999 Harrison Street, Suite 1210
6   Oakland, CA  94612
    Telephone:     415 882-5000
7   Facsimile:     415 882-0300

8   KELLY R. GRAF (SBN 301325)
    kelly.graf@dentons.com
9   DENTONS US LLP
    601 South Figueroa Street, Suite 2500
10  Los Angeles, California  90017-5704
    Telephone:     213-623-9300
11  Facsimile:     213-623-9924

12  Attorneys for Defendant
    THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

13

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16               SAN FRANCISCO DIVISION

17

18  FRANK EMERSON AND MARIA          Case No. 3:23-cv-02158-WHA
    EMERSON, BY HER GUARDIAN AD
19  LITEM, FRANK EMERSON,            **DEFENDANT THE PRUDENTIAL
                                     INSURANCE COMPANY OF AMERICA'S
20          Plaintiffs,              TRIAL BRIEF**

21      v.                           Date Complaint Served:  April 3, 2023
                                     Date Removed:  May 3, 2023
22  THE PRUDENTIAL INSURANCE         Trial Date:  October 15, 2024
    COMPANY OF AMERICA, a Corporation;
23  AND DOES 1 through 10, Inclusive,

24          Defendants.

25

26

27

28

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA  94612
(415) 882-5000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882-5000

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................ 1

II.    THE FACTS ..................................................................................... 2

    A.    Facts and Evidence on the Breach of Contract Claim ................... 2

        i.    Relevant Policy Provisions ..................................... 2

        ii.    Mrs. Emerson's Claim History and the Denial of the Instant Claim. .............. 4

        iii.    The Evidence Obtained in Litigation Corroborating Mrs. Emerson's Lack of "Severe Cognitive Impairment." ..................... 5

    B.    Facts and Evidence on the Bad Faith Claim ................................. 6

        i.    There Is No Evidence of a Biased or Insufficient Investigation. ..................... 6

        ii.    There Is No Evidence Prudential Ignored Contrary Findings. ....................... 7

    C.    Procedural Background. .............................................................. 7

III.    MOTIONS IN LIMINE AND EVIDENTIARY ISSUES ....................... 8

    A.    Prudential's Motions in Limine and Special Jury Instructions Will Significantly Alter the Scope of Evidence Presented at Trial. ..................... 8

        i.    Prudential's MIL Nos. 1 and 4, and Special Jury Instruction No. 3: Properly Defining the Policy's Coverage ..................... 8

        ii.    Prudential's Motions in Limine No. 2 and Special Instruction No. 4: Excluding Irrelevant Evidence and Focusing the Jury. ..................... 8

        iii.    Prudential's Special Instructions Nos. 1 and 2: Accurately Stating the Law and Focusing the Jury. ..................... 9

    B.    Other Significant Evidentiary Issues Will Require Rulings. ................... 10

        i.    Mrs. Emerson's Claims History. .............................. 10

        ii.    Prudential's Claims Manual. .................................... 10

        iii.    Emails from Prudential Personnel Other Than Decision-Makers or Which Were Not Part of the Claim File. ..................... 11

IV.    PLAINTIFFS' CLAIMS FAIL AND PRUDENTIAL IS ENTITLED TO JUDGMENT .... 11

    A.    Prudential Did Not Breach the Insurance Contract By Doing Precisely What It and the Law Requires It To Do. ..................... 11

B.    No Doctor Has Determined Mrs. Emerson Needs Substantial Assistance with Activities of Daily Living Due to a Covered Condition. ........................................... 12

C.    Prudential Handled Mrs. Emerson's Claim Reasonably and in Accordance with the Contract and Law. ............................................................................... 13

    i.    It Was Not Bad Faith to Review Mrs. Emerson's Claim. .............................. 13

    ii.    There Is No Bad Faith When There Is a Genuine Dispute Over Coverage. ................................................................................ 14

    iii.    An Incorrect Claims Handling Decision Is Not Bad Faith. .......................... 15

D.    Plaintiff Frank Emerson's Remaining Claims Fail. .................................................. 16

E.    Plaintiffs Cannot Recover Punitive Damages. ......................................................... 18

V.    CONCLUSION .................................................................................................................. 19

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882 5000

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. USAA Cas. Ins. Co.*,
   No. C 06-07948 WHA, 2008 WL 619004 (N.D. Cal. Mar. 4, 2008) (Alsup, J.) ...................14

*Black & Decker Disability Plan v. Nord*,
   538 U.S. 822 (2003)...................................................................................................................14

*Cardiner v. Provident Life & Acc. Ins. Co.*,
   158 F. Supp. 2d 1088 (C.D. Cal. 2001) ...............................................................................12, 14

*Case v. State Farm Mut. Auto. Ins. Co.*,
   30 Cal. App. 5th 397 (2018) .................................................................................................14, 15

*Chateau Chamberay Homeowners Assn. v. Assoc. Int'l Ins. Co.*,
   90 Cal. App. 4th 335 (2001) .....................................................................................................15

*Egan v. Mut. of Omaha Ins. Co.*,
   24 Cal. 3d 809 (1979) ...............................................................................................................18

*Fraley v. Allstate Ins. Co.*,
   81 Cal. App. 4th 1282 (2000) ...................................................................................................14

*Green Valley Landowners Assn. v. City of Vallejo*,
   241 Cal. App. 4th 425 (2015) ...................................................................................................17

*Ives v. Allstate Ins. Co.*,
   520 F. Supp. 3d 1248 (C.D. Cal. 2021) ...................................................................................14

*Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*,
   349 F.3d 1098 (9th Cir. 2003) ...................................................................................................15

*Johnson v. Holmes Tuttle Lincoln-Merc*,
   160 Cal. App. 2d 290 (1958) .....................................................................................................17

*Kaiser Engineers, Inc. v. Grinnell Fire Protection Systems Co.*,
   173 Cal. App. 3d 1050 (1985) ...................................................................................................17

*Kalmanovitz v. Bitting*,
   43 Cal. App. 4th 311 (1996) .....................................................................................................16

*Mock v. Michigan Millers Mut. Ins. Co.*,
   4 Cal. App. 4th 306 (1992) .......................................................................................................18

*Morello v. AMCO Ins. Co.*,
   650 F. App'x 522 (9th Cir. 2016)...............................................................................................14

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882-5000

*Morris v. Paul Revere Life Ins. Co.*,
109 Cal. App. 4th 966 (2003) ..............................................................15

*Murphy v. DirecTV, Inc.*,
724 F.3d 1218 (9th Cir. 2014) ................................................................3

*Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*,
55 Cal. 4th 1169 (2013) ......................................................................18

*Silberg v. Cal. Life Ins. Co.*,
11 Cal. 3d 452 (1974) ........................................................................18

*Spinks v. Equity Residential Briarwood Apartments*,
171 Cal. App. 4th 1004 (2009) ..............................................................17

*Tomaselli v. Transamerica Ins. Co.*,
25 Cal. App. 4th 1269 (1994) ...............................................................14

*Transamerica Life Insurance Co. v. Ponso*,
2020 WL 6875181 (C.D. Cal. 2020) .........................................................17

*Conservatorship of Wendland*,
26 Cal. 4th 519 (2001) ......................................................................18

*White v. Ultramar, Inc.*,
21 Cal. 4th 563 (1999) ...................................................................18, 19

*Wilcox v. Dearborn Life Ins. Co.*,
652 F. Supp. 3d 1136 (C.D. Cal. 2023) .....................................................15

**Statutes**

26 United States Code
§ 7702B(c)(2)(A)(iii) .........................................................................11

28 United States Code
§ 7702B(c)(2)(A) ...............................................................................6

California Civil Code
§ 3294..........................................................................................18

California Insurance Code
§ 10232.8(c) ....................................................................................6
§ 10232.8(c)(2) ...............................................................................11

**Rules and Regulations**

Federal Rules of Civil Procedure
Rule 35 ...........................................................................................5

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882 5000

Federal Rules of Evidence
        Rule 403 .................................................................................................................................10

**Other Authorities**

California Civil Jury Instructions
        No. 301 .................................................................................................................................16
        No. 2330 ...............................................................................................................................16
        No. 2332 ...............................................................................................................................13

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA  94612
(415) 882 5000

## I.    __INTRODUCTION__

This is a breach of contract and insurance bad faith case.  The jury will be asked to decide: according to the language of Plaintiff Maria Emerson's long-term care insurance policy, did she have "*severe* Cognitive Impairment" caused by "[a] loss or deterioration in intellectual capacity that is…comparable to and includes Alzheimer's disease and similar forms of irreversible dementia"?  And, if the answer to that is yes, was Prudential's denial of her insurance claim in 2021 unreasonable or without proper cause?

The answer to the first question is no.  Mrs. Emerson has never had "severe Cognitive Impairment," caused by a loss or deterioration in intellectual capacity that is "comparable to" Alzheimer's disease or irreversible dementia, which is how her long-term care insurance policy with Prudential defines "Cognitive Impairment."  According to repeated objective clinical cognitive testing, her level of impairment fluctuates between "mild" and "moderate"—never "severe"—and was at the lowest level of impairment tested after this lawsuit was filed. And then, just months later, during an IME done during the course of this litigation, she tested in the "not impaired" range.  Such fluctuating impairment is entirely inconsistent with a person who has the kind of "*irreversible dementia*" covered by the Policy.

Prudential does not owe Mrs. Emerson benefits under her long-term care insurance policy.  But even if the jury found that it did, there is no basis to impose bad faith liability.  Not only was Prudential required by the insurance policy and the law from which it was derived to re-evaluate Mrs. Emerson every year she sought insurance benefits, Prudential relied on the opinions of multiple experienced medical professionals to come to its conclusion that it owed no benefits.  Insurers are allowed to do precisely what Prudential did in order to determine their coverage obligations: rely on experts.  There is, at best, a genuine dispute, based on competent expert opinion, over whether Mrs. Emerson satisfies the coverage triggers.  And Prudential did not receive just one opinion and deny coverage; far from it.  Instead, in order to make sure it was correct before it denied her claim, Prudential *repeatedly* sought more information from Mrs. Emerson and her physicians and *repeatedly* sent Mrs. Emerson's file to outside reviewers for analysis.  This is not a case where the insurer kept seeking information until it found a reviewer to find no coverage—to the contrary, *not one* outside

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA  94612
(415) 882-5000

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882 5000

1    medical reviewer who looked at Mrs. Emerson's records and/or tested her in person found that she

2    was suffering "severe cognitive impairment." Prudential's conduct was reasonable.

3         Finally, Plaintiff Frank Emerson is a sideshow in this case. He purports to join Mrs.

4    Emerson's breach of contract and bad faith claims, yet he is not a party to, or third party beneficiary

5    of, Mrs. Emerson's insurance policy with Prudential. He cannot sue on a contract to which he has no

6    legal connection, nor did Prudential owe him any duties related to his bad faith claim. His claims are

7    legally unsupportable and the Court should so find.

8    **II.    THE FACTS**

9         **A.    Facts and Evidence on the Breach of Contract Claim**

10             **i.    Relevant Policy Provisions**

11        Prudential issued Mrs. Emerson a federally-qualified individual long-term care ("LTC")

12   insurance policy, effective starting in December 2002 (the "Policy") (Tr. Ex. 50). The Policy

13   provides coverage where the insured suffers from a "Chronic Illness or Disability," which the Policy

14   defines as either (1) a "loss of the ability to perform, without Substantial Assistance, at least two

15   Activities of Daily Living" ("ADLs") for at least 90 consecutive days, or (2) a "severe Cognitive

16   Impairment, which requires Substantial Supervision to protect [the insured] from threats to health or

17   safety." Tr. Ex. 50 at p. 14, ¶ B.

18        To be eligible under the second prong, an insured must have a "severe Cognitive

19   Impairment." Under the Policy, a "Cognitive Impairment" is defined as:

20        A loss or deterioration in intellectual capacity that is:
              1)  Comparable to and includes Alzheimer's disease and similar
21                forms of irreversible dementia;
              2)  Measured by clinical evidence and standardized tests that reliably measure
22                impairment in the individual's:
                  a)  short-term or long term memory;
23                b)  orientation as to people, places, or time and
                  c)  deductive or abstract reasoning.
24

25   Tr. Ex. 50, p. 8. Diagnosis of a cognitive impairment is insufficient, on its own, to trigger eligibility

26   under the Policy; the cognitive impairment must be "severe." And the Policy provides that

27   "eligibility [for benefits] will be confirmed or denied based on Prudential's use of objective standards

28   of measurement such as . . . 'Folstein's Mini-Mental Examination," (also referred to as the "MMSE")

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882 5000

1  or other "equivalent" tests.  Tr. Ex. 50, p. 14.  There are generally accepted ranges of MMSE scores

2  that denote varying levels of cognitive impairment.  Higher scores indicate less cognitive impairment;

3  lower scores indicate more.  An MMSE score of 20 or more indicates "mild" cognitive impairment;

4  greater than 10 and less than 19, "moderate"; and less than 9, "severe."  Tr. Ex. 234 at 2.

5      A cognitively impaired insured must also require "Substantial Supervision," defined as

6  "[c]ontinual oversight that may include cueing by verbal prompting, gestures, or other demonstrations

7  by another person, and which is necessary to protect [the insured] from threats to [their] health or

8  safety."  Tr. Ex. 50, p. 11.  Importantly, the Policy requires that the "loss or deterioration in

9  intellectual capacity" must be "measured by standardized tests[.]"

10      The cause of the "severe Cognitive Impairment" also matters.  This is plainly stated in the

11  Policy's definition of "Cognitive Impairment": a "loss or deterioration in intellectual capacity that is:

12  1) *Comparable to and includes Alzheimer's disease and similar forms of irreversible dementia;* 2)

13  Measured by clinical evidence and standardized tests that reliably measure impairment in the

14  individual's: a) short-term or long term memory; b) orientation as to people, places, or time and c)

15  deductive or abstract reasoning."  Tr. Ex. 50, p. 8 (italics added).  Psychiatric illnesses are not

16  covered because they are not "comparable to Alzheimer's disease and similar forms of irreversible

17  dementia," which are organic brain disorders that do not fluctuate or get better over time—they get

18  progressively worse and are not reversible.[1]

19      The record is replete with evidence that Mrs. Emerson, unfortunately, suffers from psychiatric

20  issues.  *E.g.*, Tr. Ex. 118 at 2.  But no doctor reviewing Mrs. Emerson's claim in 2021 determined

21  that she had "severe Cognitive Impairment" caused by an organic brain disorder such as "Alzheimer's

22  disease and similar forms of irreversible dementia."  Indeed, "standardized tests that reliably measure

23  impairment"—revealed *improving* cognitive scores, which is inconsistent with "Alzheimer's disease

24  and similar forms of *irreversible* dementia" as a cause for the mild cognitive impairment she did

25  exhibit.  Tr. Ex. 118 at 1.

---

[1] Even if the Policy were not clear, the maxim of contract interpretation *expressio unius est exclusio alterius* would lead to the same result:  the Policy lists specific causes of "Cognitive Impairment" that are covered, so it necessarily implies that unlisted causes are not covered.  *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2014) ("The California Supreme Court has observed that . . . 'mention of one matter implies the exclusion of all others' is 'an aid to resolve the ambiguities of a contract.'").

1       **ii.**    **Mrs. Emerson's Claim History and the Denial of the Instant Claim.**

2       From 2012 to 2020, Mrs. Emerson received LTC policy benefits. She did not claim that she

3    could not perform any ADLs.[2] Rather, her annual claims for benefits were based on her own doctors'

4    assessments of her cognitive functioning. She had fluctuating *and improving* MMSE scores, all of

5    which were inconsistent with "severe" cognitive impairment. Nevertheless, based on Mrs. Emerson's

6    doctors' reports, Prudential approved her claims out of an abundance of caution. This was before it

7    ever examined her in person. Outside reviews of her medical file (that is, reviews performed by third

8    parties at Prudential's request) in 2015 and 2016 expressed concern that Mrs. Emerson was not

9    eligible for benefits under the Policy; Prudential kept Mrs. Emerson's benefits active based on

10   certifications from her own physicians. The questions continued through 2019; at that time, Mrs.

11   Emerson's own psychiatrist described her cognitive impairment as "moderate." Prudential approved

12   her for benefits in 2019 based on her own doctors' certifications, but indicated it would order

13   complete medical records for her in the following assessment year.

14      In 2020—the time period covering the claim actually at issue in this lawsuit—Prudential

15   requested that Mrs. Emerson's psychiatrist complete a questionnaire assessing Mrs. Emerson's

16   cognitive function. His answers indicated only *mild* cognitive impairment. Prudential did not deny

17   her claim; it referred Mrs. Emerson's claim to its medical director for review. Prudential's third-party

18   administrator's medical director, Dr. John Nye, then reviewed Mrs. Emerson's file. Dr. Nye found

19   "insufficient medical record documentation" of "severe cognitive impairment" based on an MMSE

20   score that was in the "mild impairment" range. He further noted Mrs. Emerson's issues appeared to

21   be "psychiatric" as opposed to cognitive. He recommended that the third party administrator request

22   additional records, which were obtained. Dr. Nye reviewed Mrs. Emerson's file again in January

23   2021 after additional records were received. He again concluded Mrs. Emerson did not meet the

24   "severe Cognitive Impairment" coverage trigger and that her issues were psychiatric in nature.

---

25   [2] Until long after this lawsuit was filed, Mrs. Emerson did not claim that the ADL coverage trigger
26   was relevant to her claim. Now, at the eleventh hour, Plaintiffs have raised the ADL coverage trigger
     for some vaguely specified reason related to their bad faith claim. They also claim to "reserve the
27   right" to assert the ADL trigger as a basis for coverage, but to date have not done so. The Court
     should seek Plaintiffs' final answer on whether they are proceeding to trial on the ADL coverage
     trigger as a basis for coverage, or otherwise to clearly state the basis for which they intend to
28   introduce evidence on the ADL coverage trigger so that the Court and Prudential can understand
     Plaintiffs' position.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882-5000

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882 5000

1   Prudential still did not deny Mrs. Emerson's claim.  Instead, it engaged another outside reviewer to

2   investigate.  Dr. David Yuppa reviewed Mrs. Emerson's file in February 2021 and discussed Mrs.

3   Emerson's records with her treating psychiatrist, Dr. Joseph Greene, who had filled our benefit

4   eligibility forms for Mrs. Emerson.  Dr. Yuppa also determined she did not have "severe Cognitive

5   Impairment," instead finding that there was a "considerable psychiatric overlay" to Mrs. Emerson's

6   symptoms and recommended neuropsychological testing.  Prudential again did not deny her claim;

7   instead, it requested Mrs. Emerson undergo a neuropsychological examination.  Dr. Maya Yutsis

8   performed the examination and determined there was no valid or objective evidence of cognitive

9   impairment to support a neurological cause of her claimed deficits.  After yet another review by Dr.

10   Nye—who noted that Mrs. Emerson's fluctuating MMSE scores were "in direct conflict with known

11   dementia"—only then did Prudential deny Mrs. Emerson's claim in October 2021, after investigation

12   by three different outside medical professionals who came to consistent conclusions.

### iii.   The Evidence Obtained in Litigation Corroborating Mrs. Emerson's Lack of "Severe Cognitive Impairment."

15   After Mrs. Emerson filed this lawsuit, the parties stipulated to Mrs. Emerson undergoing two

16   Rule 35 independent medical examinations, to be performed by a neurologist and neuropsychologist.

17   Dkts. 30-31.

18   In April 2024, neuropsychologist Dr. Stephen Francis examined Mrs. Emerson.  He

19   determined that Mrs. Emerson did not suffer from a severe cognitive impairment and reported that

20   Mrs. Emerson identified as independent with respect to all of her ADLs (except she purportedly

21   required standby assistance for one component of the bathing ADL).  He further concluded that if she

22   did require assistance with ADLs, it was due only to acute psychiatric issues.  At this IME, Mrs.

23   Emerson scored a 27/30 on her MMSE, *her highest MMSE score to date*, a score that is consistent

24   with normal, unimpaired cognition.  Tr. Ex. 229 at 19.

25   In May 2024, Dr. John Hixson, a Clinical Neurology professor at UCSF, examined Mrs.

26   Emerson and her medical file. Dr. Hixson concluded that Mrs. Emerson likely suffered from a *mild*

27   cognitive impairment—not severe cognitive impairment—and stated he could not identify any

28   "neurologic cause" for her condition. He explained that Mrs. Emerson's history and medical records

do not support diagnoses of Alzheimer's, Lewy Body dementia, fronto-temporal dementia (behavioral variant), or Parkinson's.  Tr. Ex. 227 at 9, ¶ 5.

Mrs. Emerson's lifestyle is also inconsistent with that of a person with *severe* cognitive impairment caused by irreversible dementia. For example, she has taken multiple, long-haul international flights (to the Philippines and to Vancouver) by herself.  She can coherently describe in detail her day-to-day routines without prompting, as well as recall details of her life's history over many years.  She is able to use a smartphone independently to watch videos and communicate with family. As another example, she regularly cooks meals for herself and for Mr. Emerson without reference to recipes.  As multiple doctors will testify, these and other facets of Mrs. Emerson's life would be impossible for a person with severe cognitive impairment caused by irreversible dementia.

**B.   Facts and Evidence on the Bad Faith Claim**

**i.   There Is No Evidence of a Biased or Insufficient Investigation.**

Plaintiffs have and will argue that Prudential's investigation of Mrs. Emerson's claim was insufficient and tainted by the bias (towards Prudential) of the various medical professionals who reviewed her claim.  In order to make a claim handling decision on a LTC insurance policy, under California law, the claim must be reviewed by a "licensed health care practitioner, independent of the insurer, [who] shall certify that the insured meets the definition of 'chronically ill individual' as defined under [28 U.S.C. § 7702B(c)(2)(A)]."  Cal. Ins. Code, § 10232.8(c).  Without the certification from the practitioner, the insured does not qualify for benefits.  Tr. Ex. 50, p. 11, ¶ B, Benefit Eligibility Criteria ("In order to receive benefits you must FIRST be assessed by an Assessor"); *id.*, p. 4 (defining "Assessor" as a "licensed health care practitioner"); *id.*, p. 6 (defining licensed health care practitioner").

Here, Prudential utilized the services of a third-party administrator, CHCS, Inc. ("CHCS") (which employs licensed healthcare practitioners), to investigate Mrs. Emerson's claim at issue in this lawsuit.  None of the professionals who investigated Mrs. Emerson's claim were Prudential employees; none of their compensation was tied to the outcome of the claim; and one of them, Dr. Maya Yutsis, had never worked with Prudential or CHCS before or since.  The medical experts—Drs. Nye, Yutsis, and Yuppa—were never told Mrs. Emerson's claim was initially tagged for review as a

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA  94612
(415) 882 5000

potential "Fraud, Waste & Abuse" matter.  Plaintiffs will be unable to point to any evidence of any substantial bias that would have affected the outcome of any of these reviews.  Prudential would have been well within its rights to deny Mrs. Emerson's claim each time it received a determination from one of these outside professionals that she did not meet the coverage triggers, yet it did the opposite: it continually ordered more reviews.  Prudential's investigation was thorough.[3]

### ii.   There Is No Evidence Prudential Ignored Contrary Findings.

Plaintiffs have not and cannot point to any instance during the pendency of Mrs. Emerson's insurance claim where Prudential ignored any findings that showed her either to have "severe Cognitive Impairment" caused by "[a] loss or deterioration in intellectual capacity that is…comparable to and includes Alzheimer's disease and similar forms of irreversible dementia" or "[a] loss of the ability to perform" at least two ADLs.  At no point has any physician diagnosed Mrs. Emerson with any organic brain disorder of any kind.  Nor has any professional determined that she has lost the *ability* to perform any ADL.  While Plaintiffs may point to evidence of Mrs. Emerson receiving assistance—even substantial, daily assistance—from Mr. Emerson, that is not a coverage trigger.  Nor is the fact that she may have *some* "Cognitive Impairment" as defined by the Policy. She must *unable* to perform ADLs, and she must have "*severe* Cognitive Impairment" as measured by objective testing.  There is simply no evidence of either that Prudential unreasonably ignored.

### C.   Procedural Background.

This case was originally filed in Monterey County Superior Court on March 30, 2023. Prudential was served on April 3, 2023.  Prudential removed the case to this Court on May 3, 2023. Trial was initially set for September 16, 2024.  The parties stipulated to, and the Court granted, a continuance of the trial to a trial date of November 18, 2024.  At the June 13, 2024 status conference, the Court advanced the trial date to the current date of October 15, 2024.  The Final Pretrial Conference is set for October 7, 2024.

---

[3] Plaintiffs will make much of the fact that Mrs. Emerson's claim was referred to Prudential's "Fraud, Waste and Abuse" group and cherrypicked snippets of its claim handling guidelines purport to say various things helpful to their case.  Both pieces of evidence are simply irrelevant; the Policy language and the law controlled how Prudential evaluated Mrs. Emerson's claim, not anything else.

Dentons US LLP
1999 Harrison Street, Suite 1210
Oakland, CA  94612
(415) 882 5000

1

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882-5000

### III.   MOTIONS IN LIMINE AND EVIDENTIARY ISSUES

#### A.   Prudential's Motions in Limine and Special Jury Instructions Will Significantly Alter the Scope of Evidence Presented at Trial.

Prudential and Plaintiffs have moved in limine on a number of different issues, all of which are important to how this case will ultimately be tried to the jury.[4]

##### i.   Prudential's MIL Nos. 1 and 4, and Special Jury Instruction No. 3: Properly Defining the Policy's Coverage

*What these are asking for:*  MIL No. 1 asks the Court to interpret the Policy according to its plain language, requiring "severe Cognitive Impairment" and excluding psychiatric conditions as a covered cause of same.  MIL No. 4 asks the Court to bar evidence and argument that Mrs. Emerson is eligible for coverage under the Policy's ADL trigger.  Prudential's Special Instruction No. 3 asks the Court to instruct the jury in accordance with the Policy's language.[5]  Allowing Plaintiffs to attempt to introduce evidence and argue otherwise would be improper, confusing, and a waste of time.

*Why these matter:*  If the Court grants these motions, significant amounts of evidence extrinsic to the Policy itself will be off-limits and will never need to be discussed.  Giving Prudential's Special Instruction No. 3 will focus the jury on the *relevant* policy language—the "severe Cognitive Impairment" trigger, exactly as written, and identifying that "severe Cognitive Impairment" does not include psychiatric illnesses.

##### ii.   Prudential's Motions in Limine No. 2 and Special Instruction No. 4: Excluding Irrelevant Evidence and Focusing the Jury.

*What these are asking for:*  MIL No. 2 asks the Court to exclude evidence that Prudential stopped selling long-term care ("LTC") insurance in 2012 (and why), Prudential's LTC division's financial performance in 2017 through 2020, and Prudential's 2019 implementation of a "Fraud, Waste and Abuse" program for its LTC division (and why it did so).  None of these issues have any

---

[4] Prudential respectfully refers the Court to its motions in limine and separate briefing regarding jury instructions for a full discussion of these issues, but highlights their importance here for the Court's consideration.

[5] Plaintiffs also stated, vaguely, in a subsequent meet-and-confer that they will argue "that the findings of at least one of the defense experts [presumably Dr. Yuppa] re: ADLs is relevant evidence on the issue of bad faith."  It is unclear how it is relevant if they are not pursuing it as a coverage trigger; the Court should seek an answer from Plaintiffs on this important issue.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882 5000

bearing on whether Prudential's claims handling decision *for Mrs. Emerson's claim* was correct or reasonable—the key issues in this case.  Bringing up each of these issues would require a separate mini-trial with Plaintiffs and Prudential each attempting to explain their side of why certain things did or did not happen over the course of more than 10 years, none of which is specific to Mrs. Emerson or to Plaintiffs' claims.  Prudential's Special Instruction No. 4 tells the jury, accurately, that the law does not recognize that the simple fact of hiring experts creates bias.

*Why these matter:*  MIL No. 2 will prevent the need for multiple sideshow mini-trials and will avoid the high likelihood that the jury will decide this case on what it thinks of Prudential generally, rather than what Prudential did with Mrs. Emerson's claim.  Special Instruction No. 4 will, again, keep the jury focused on what matters: what Prudential's experts *did*, not the irrelevant fact that Prudential hired them.

### iii.    Prudential's Special Instructions Nos. 1 and 2: Accurately Stating the Law and Focusing the Jury.

*What these are asking for:*  Special Instruction No. 1 accurately states the "genuine dispute doctrine" for the jury and reminds them that Prudential was entitled to reasonably rely on experts when deciding on how to handle Mrs. Emerson's claim.  Likewise, Special Instruction No. 2 accurately states the law that just because Prudential denied Mrs. Emerson's claim, it did not necessarily commit bad faith.

*Why these matter:*  Both of these special instructions will necessarily limit inappropriate argument and the need for complex and hard-to-follow limiting instructions.  The jury should know that the law considers certain decisions not unreasonable and not, in and of themselves, bad faith.  The instructions will allow counsel to appropriately argue these points to the jury with reference to the law.[6]

---

[6] Prudential's Motions in Limine Nos. 5 (to exclude undisclosed evidence related to *Brandt* attorneys' fees, and 6 (to exclude late-disclosed unretained experts) are also important and will limit the time consumed in Court.  Prudential respectfully refers the Court to those motions for more detail.

1

**B.**     **Other Significant Evidentiary Issues Will Require Rulings.**

2          While Prudential raised some of the most significant evidentiary issues by motions in limine,

3    Prudential also wishes to highlight additional, significant issues for the Court's consideration as the

4    trial progresses.

5          **i.**     **Mrs. Emerson's Claims History.**

6          Prudential did not move in limine to exclude all reference to Mrs. Emerson's claim history

7    from 2012 to 2019, even though (1) it is not relevant to whether her 2020 claim was correctly

8    decided, and (2) Prudential was required to re-evaluate Mrs. Emerson for benefit eligibility each year.

9    Prudential and Plaintiffs will undoubtedly need to refer to Mrs. Emerson's claim history, at the very

10   least, as background and history of her interactions with Prudential and as evidence of her physical

11   and mental state over that time.  Certainly, Prudential will not attempt to make the correctness of the

12   2012-2019 claim decisions an issue, but it expects Plaintiffs will.  As described below, the fact that

13   Mrs. Emerson sought and received LTC insurance benefits from 2012 to 2019 has no substantive

14   bearing on her claims in this case.  Attempts to use Mrs. Emerson's claim history as evidence of her

15   entitlement to benefits in her last claim would be necessitate classic mini-trials, requiring reams of

16   evidence related to those claims so that the jury could have a complete understanding of Prudential's

17   historical claim handling decisions—decisions that Plaintiffs will likely attempt to use in an

18   inappropriately prejudicial way to prove Mrs. Emerson's *current* entitlement to benefits.  Prudential

19   will make Rule 403 objections as appropriate, but the Court should be aware of this issue in advance.

20         **ii.**     **Prudential's Claims Manual.**

21         Prudential's claims handling manual is the subject of its motion in limine no. 1 to exclude

22   evidence and argument to expand the policy's coverage beyond the policy itself.  Nonetheless, there

23   are conceivable, appropriate purposes for which the claims handling manual will be mentioned at trial

24   by both sides.  There is nothing wrong *per se* about mentioning the claims handling manual, or that

25   Prudential used it when processing Mrs. Emerson's 2020 LTC insurance claim.  However, a

26   relevance and Rule 403 problem results when Plaintiffs attempt to use any portion of the manual to

27   change the Policy's coverage.  Prudential expects Plaintiffs will do just that through suggesting that

28   Prudential interpreted, or should have interpreted, the Policy to cover psychiatric-origin "severe

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA  94612
(415) 882 5000

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882 5000

Cognitive Impairment," even though the Policy plainly does not cover it. Prudential, again, will make objections as appropriate and depending on what how this evidence is used, may need to request limiting instructions so that the jury is not confused about the import of the non-policy claims handling manual.

### iii. Emails from Prudential Personnel Other Than Decision-Makers or Which Were Not Part of the Claim File.

Prudential will lodge separate objections to Plaintiffs' trial exhibits as required by the Court's standing order, but wishes to highlight this issue here. Prudential expects that Plaintiffs will attempt to introduce numerous emails Prudential produced in discovery from persons *other than* those who made claim handling decisions or that were otherwise *not* part of the claim file and had no bearing on Mrs. Emerson's claim. Again, separate from specific objections to each of those exhibits, the overarching problem is that Plaintiffs are attempting to litigate this case using irrelevant statements from personnel who had no involvement in Prudential's decision to deny Mrs. Emerson's claim, and otherwise were not generated as part of that process. The Court should be aware of this so that it can focus Plaintiffs on the evidence that the jury *needs* to see in this case: how and why Prudential handled Mrs. Emerson's claim, and not the unrelated statements of people about other issues.

## IV. PLAINTIFFS' CLAIMS FAIL AND PRUDENTIAL IS ENTITLED TO JUDGMENT

### A. Prudential Did Not Breach the Insurance Contract By Doing Precisely What It and the Law Requires It To Do.

Mrs. Emerson's LTC insurance policy is based entirely on and follows federal and state law. It is tax-qualified, that is, its benefits are not taxable. It must follow federal and state law precisely in order to be tax qualified. Every beneficiary of such a policy must be evaluated *every year* in order to determine eligibility for policy benefits: a "chronically ill individual" entitled to benefits "shall not include any individual . . . unless within the preceding 12-month period a licensed health care practitioner has certified that such individual" meets the requirements for obtaining policy benefits. 26 U.S.C. § 7702B(c)(2)(A)(iii). Likewise, California law requires that the required "written certification" that an insured is a "chronically ill individual" entitled to benefits "shall be renewed every 12 months." Cal. Ins. Code § 10232.8(c)(2).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882-5000

That is precisely what Prudential did.  Mrs. Emerson had been receiving LTC policy benefits since 2012 until the time came for her annual evaluation came in 2021.  Following federal and state law, Prudential conducted another review—with three different professionals evaluating Mrs. Emerson—and concluded she did not have "severe Cognitive Impairment" caused by "[a] loss or deterioration in intellectual capacity that is... [c]omparable to and includes Alzheimer's disease and similar forms of irreversible dementia," as required by the policy.  Her benefits were therefore terminated.  The fact that Mrs. Emerson had been receiving benefits is legally irrelevant.  *Cardiner v. Provident Life & Acc. Ins. Co.*, 158 F. Supp. 2d 1088, 1100 (C.D. Cal. 2001) (granting summary judgment for insurer on bad faith claim where insured had previously been found to be disabled, agreeing with insurer that it was "entitled to investigate and evaluate [the insured's] claim on a periodic basis to determine whether he was entitled to further benefits, even though he has been paid benefits in the past.").  Moreover, as a matter of logic, it cannot be a breach of a contract—and thus it cannot be an act of bad faith—to do something the contract *allows a party to do*.  Here, the absence of evidence of a breach is even stronger because not only the Policy allowed Prudential to investigate Mrs. Emerson's claim, the California Insurance Code *required* Prudential to obtain the necessary evidence supporting her qualification for benefits every year.

**B.      No Doctor Has Determined Mrs. Emerson Needs Substantial Assistance with Activities of Daily Living Due to a Covered Condition.**

Despite not raising the issue of whether Mrs. Emerson qualified for benefits under the ADL trigger until opposing Prudential's motion for partial summary judgment, Plaintiffs made much of that issue at the hearing.  There is simply no evidence that Mrs. Emerson qualifies under the ADL coverage trigger under the plain language of the policy.  Again, to qualify under the ADL trigger, an insured must suffer the "loss of the *ability to perform*, without Substantial Assistance, at least two Activities of Daily Living."   Tr. Ex. 50 at 7 (added italics).  As defined in the policy, he ADLs are functional and concern physical ability:  washing oneself, putting on and taking off clothing, feeding oneself, etc.  *Id.*  And, "Substantial Assistance" is defined, as, "[t]he *physical assistance* of another person without which [the insured] would not be able to perform an Activity of Daily Living" or the need for another person to be in arm's reach "to prevent, by *physical intervention*, injury to [the

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882 5000

insured]" while performing an ADL.  *Id.* at 11 (added italics).  Thus, the ADL coverage trigger requires that the insured be physically incapable of performing at least two ADLs or need another person close to them to physically assist them to prevent injury.  It clearly does *not* concern an inability to perform ADLs as a result of psychiatric conditions, that is, a situation in which an insured has the ability to perform ADLs without supervision but due to *behavior* may not be able to do so.

Here, at best, Plaintiffs could point to Dr. Yuppa's conclusion that Mrs. Emerson required substantial assistance with bathing and "intermittent/occasional" assistance for dressing and toileting—but Dr. Yuppa clearly concluded that these limitations were *not* functional or physical and instead were due to her "underlying psychiatric condition."  Equally unhelpful is any testimony from Mr. Emerson that he assists Mrs. Emerson with any ADLs, because at no point did he testify that she is *physically* incapable of performing any of them.  At no point has any physician or other witness testified that her limitations are functional or physical.  That is precisely why Prudential has moved in limine in to exclude evidence or argument regarding the ADL trigger—it simply has nothing to do with this case.

**C.**   **Prudential Handled Mrs. Emerson's Claim Reasonably and in Accordance with the Contract and Law.**

**i.**   **It Was Not Bad Faith to Review Mrs. Emerson's Claim.**

Plaintiffs make much of the fact that Mrs. Emerson's claim subject to a "Fraud, Waste, and Abuse" review.  Plaintiffs have no evidence that Prudential believed, at any time, that Mrs. Emerson was committing insurance fraud or was abusing her entitlement to policy benefits.  It is ultimately *irrelevant* why Mrs. Emerson's claim was reviewed, because, as discussed above, it was *required* to be reviewed, every year, to ensure she was still entitled to benefits.  Prudential had no discretion under the contract or law to forego an annual review of her entitlement to benefits.  The fact that a perhaps provocatively-named unit of the company was involved in that review means nothing; the review was going to happen no matter what.  Prudential could not rely—and likewise Plaintiffs cannot rely—on the fact that Mrs. Emerson had been receiving benefits in the past as evidence that she should continue to receive them in the future.  The jury will be asked to decide whether "Prudential acted unreasonably, that is, without proper cause[.]"  CACI No. 2332 (introduction).  A

claim handling decision logically cannot be unreasonable or lacking proper cause to do what the insurance contract and law allow (or in this case, require).  *Case v. State Farm Mut. Auto. Ins. Co.*, 30 Cal. App. 5th 397, 415 (2018) (affirming summary judgment for insurer on bad faith where policy provision and Insurance Code section "expressly authorized" conduct claimed to be evidence of bad faith); *Cardiner*, 158 F. Supp. 2d at 1100 (granting summary judgment for insurer on bad faith, even though insured was previously on claim for several years, as, *inter alia*, the policy provided the insurer a right to periodically examine the insured for proof of continued disability).

**ii.      There Is No Bad Faith When There Is a Genuine Dispute Over Coverage.**

"The mistaken withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269 (1994).  "The 'genuine dispute' doctrine may be applied where the insurer denies a claim based on the opinions of experts." *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292–93 (2000); *Ives v. Allstate Ins. Co.*, 520 F. Supp. 3d 1248, 1256 (C.D. Cal. 2021); *see Morello v. AMCO Ins. Co.*, 650 F. App'x 522, 523 (9th Cir. 2016) (affirming summary judgment against bad faith tort claim where insurer reasonably relied on physician's expert opinion that insured was not entitled to future medical care, particularly since nurse and another physician reached similar conclusion).

Prudential has requested the Court give its Special Instruction No. 3 so that the jury understands this important issue:  "There is nothing per se wrong with an insurance company relying on its own retained experts or employees," and even a "substantial disparity" in expert opinions "does not, by itself, suggest the insurer acted in bad faith." *Anderson v. USAA Cas. Ins. Co.*, No. C 06-07948 WHA, 2008 WL 619004, at *9 (N.D. Cal. Mar. 4, 2008) (Alsup, J.); *see also Cardiner*, 158 F. Supp. 2d at 1101 ("The mere fact that these doctors have been hired by insurers rather than insureds does not support bias. Indeed, if this were the case, then most experts in any case would be deemed bias[ed].").  Courts have also held that opinions of an insured's treating physicians are not accorded special deference or weight—*i.e.*, the opinions or advocacy of treating physicians do not outweigh the weight of consulted experts. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003);

Dentons US LLP
1999 Harrison Street, Suite 1210
Oakland, CA  94612
(415) 882 5000

1    *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1109 n.8

2    (9th Cir. 2003); *Wilcox v. Dearborn Life Ins. Co.*, 652 F. Supp. 3d 1136, 1139 (C.D. Cal. 2023).

3              Here, there is, at the very least, a genuine dispute over whether Mrs. Emerson suffers from a

4    "severe Cognitive Impairment" covered by the policy.[7]  Prudential unquestionably relied on its

5    outside experts to make its coverage determination.  When there is such a genuine dispute, "there can

6    be no bad faith liability imposed on the insurer for advancing its side of that dispute."  *Chateau*

7    *Chamberay Homeowners Assn. v. Assoc. Int'l Ins. Co.*, 90 Cal. App. 4th 335, 347 (2001) (italics

8    omitted).  The jury should be so instructed.  Similarly, to the extent that there is a dispute over the

9    *meaning* of "severe Cognitive Impairment" and whether it covers psychiatric illnesses, again, as a

10   matter of law, Prudential did not commit bad faith by advancing its interpretation of the Policy.

11   Where the insurer's coverage decision turns on a legal issue, such as policy interpretation, and the law

12   is unsettled regarding that issue, the insurer is entitled to apply any reasonable interpretation that

13   favors its own interests; i.e., it need not adopt an interpretation favorable to the insured.  *E.g.*, *Morris*

14   *v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 973-74 (2003) (affirming summary judgment on

15   bad faith claim on the basis that the insurer's denial of disability claim, although incorrect, was

16   objectively reasonable).  Although the Policy language is clear, there is no settled legal authority

17   interpreting "severe Cognitive Impairment" in the Policy.  Prudential's view that it excludes

18   psychiatric illnesses—as evidenced by the policy language itself—was objectively reasonable.  Even

19   if the Court ultimately finds it was incorrect, it was not bad faith as matter of law for Prudential to

20   come to that conclusion.

21              **iii.    An Incorrect Claims Handling Decision Is Not Bad Faith.**

22              "To establish bad faith, a policy holder must demonstrate misconduct by the insurer more

23   egregious than an incorrect denial of policy benefits."  *Case*, 30 Cal. App. 5th at 402.  Even if

24   Prudential breached the insurance contract and should have paid Mrs. Emerson's claim, that is not by

25   itself evidence of bad faith.  The denial must have been unreasonable or without proper cause.  This is

26   made clear by the introductory CACI instruction on bad faith claims:  "To breach the implied

27   covenant of good faith and fair dealing, an insurance company must unreasonably act or fail to act in

28   _____

[7] The "loss of the ability to perform, without Substantial Assistance, at least two Activities of Daily Living" coverage trigger was not the focus of Mrs. Emerson's underlying claim.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA  94612
(415) 882 5000

a manner that deprives the insured of the benefits of the policy.  To act unreasonably is not a mere failure to exercise reasonable care."  CACI No. 2330.  This is the corollary of the rule that a genuine dispute precludes bad faith liability:  an insurer is allowed to be wrong *in good faith*, and simply be required to pay the policy benefits and nothing more.  Again, here, Prudential certainly believes its denial was correct.  But even if the jury disagrees, Prudential must have done something *unreasonable* by denying Mrs. Emerson's claim if she is to recover for bad faith.  There is simply no evidence of that because it is reasonable, as a matter of law, for an insurer to rely on independent experts to support its claim handling decision and to advance its position in a genuine dispute.  Those are the two key issues on which Plaintiffs base their bad faith claims, and they cannot support liability.

### D.    Plaintiff Frank Emerson's Remaining Claims Fail.

Plaintiff Frank Emerson's remaining claims are subject to Prudential's pending motion for judgment on the pleadings (Mr. Emerson's claims for breach of contract and bad faith). (Dkt. 59.) Mr. Emerson's claim for intentional infliction of emotion distress has been dismissed by the Court's ruling on Prudential's motion for summary judgment.  (Dkt. 46.)   Prudential provides this discussion in the event the Court denies the motion for judgment on the pleadings, as it will have a significant effect on the scope of evidence that may be presented at trial.

Plaintiff Frank Emerson cannot maintain his breach of contract and bad faith claims.  He must prove that he was an intended beneficiary of the contract.  *See* CACI No. 301.  As an initial matter, the Court should decide this in Prudential's favor without submitting it to the jury.  "The right of a third-party beneficiary to enforce a contract might not be a question for the jury to decide.  Third—party beneficiary status may be determined as question of law if there is no conflicting extrinsic evidence."  CACI No. 301, Directions for Use (citing *Kalmanovitz v. Bitting*, 43 Cal. App. 4th 311, 315 (1996).

Mr. Emerson is not a party to Mrs. Emerson's LTC insurance contract, nor is he a third-party beneficiary.  The policy defines "You, Your, and Yours" as "[t]he person who is the Insured."  Tr. Ex. 50 at 11.  That is, those words refer to Mrs. Emerson alone and not to anyone else, because she is the insured.  The policy "pays benefits for Eligible Charges incurred by you" for various kinds of

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA  94612
(415) 882-5000

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA  94612
(415) 882 5000

care.  *Id.* at 12.  Prudential agreed to pay "all . . . indemnities . . . to the Insured," except for indemnities unpaid when the insured dies, which may "at Prudential's option, be paid to the Insured's estate."

"The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the Contract." *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1021 (2009). "If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplated a benefit to the third person." *Id.* (citing *Johnson v. Holmes Tuttle Lincoln-Merc*, 160 Cal. App. 2d 290, 297 (1958) ). Under the intent test, "it is not enough that the third party would incidentally have benefitted from performance." *Id.* "The contracting parties must have intended to confer a benefit on the third party." *Id.* However, the "third person need not be named or identified individually to be an express beneficiary." *Id.* (citing *Kaiser Engineers, Inc. v. Grinnell Fire Protection Systems Co.*, 173 Cal. App. 3d 1050, 1055 (1985) ).

Here, under Plaintiffs' allegations, Mr. Emerson "would have benefitted" from Prudential continuing to pay Mrs. Emerson benefits. Dkt. 1, at ECF p. 14, ¶ 32.  But that is not sufficient: the mere fact that Mrs. Emerson alleges she intended to benefit Mr. Emerson by procuring her long-term care insurance is not enough.  Rather, the *contract itself* must evidence an intent to benefit Mr. Emerson, or a class of persons in Mr. Emerson's position.  *Transamerica Life Insurance Co. v. Ponso*, 2020 WL 6875181, at *4 (C.D. Cal. 2020).  It does not, so Mr. Emerson cannot maintain a claim for breach of a contract to which he is not a party.

As for bad faith, "[t]he prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract."  *Green Valley Landowners Assn. v. City of Vallejo*, 241 Cal. App. 4th 425, 433 (2015).  There is no "contractual relationship" between Mr. Emerson and Prudential, either as parties to a contract or with Mr. Emerson as a third-party beneficiary of Mrs. Emerson's contract.  Therefore, Mr. Emerson's bad faith claim fails as a matter of law.

1

### E.   Plaintiffs Cannot Recover Punitive Damages.

To establish entitlement to punitive or exemplary damages under California law, a plaintiff must present "clear and convincing evidence" that an officer, director or managing agent acted with "oppression, fraud or malice" which is "sufficiently strong to command the unhesitating assent of every reasonable mind."[8]   Cal. Civ. Code § 3294; *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 566 (1999); *Conservatorship of Wendland*, 26 Cal. 4th 519, 552 (2001).  "Oppression" and "malice" in turn, mean "despicable" conduct that is so "vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people."  *Mock v. Michigan Millers Mut. Ins. Co*., 4 Cal. App. 4th 306, 331 (1992).

A breach of contract is not itself evidence of fraudulent intent.  *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*, 55 Cal. 4th 1169, 1183 (2013).  Likewise, "[m]ere breach of the covenant of good faith and fair dealing is in itself insufficient to support a finding of intent necessary to justify an award of punitive damages."  *Egan v. Mut. of Omaha Ins. Co*., 24 Cal. 3d 809, 828 (1979).  Even proof of bad faith on Prudential's part would not, without more, warrant punitive damages.  *Silberg v. Cal. Life Ins. Co.*, 11 Cal. 3d 452, 462-63 (1974) (to support an award of punitive damages, the plaintiff must show more than bad faith by the insurer; she must show "oppression, fraud, or malice.").  To establish entitlement to punitive damages, "it must be shown by *clear and convincing evidence* that the insurer, has acted maliciously, oppressively or fraudulently."  *Mock*, 4 Cal. App. 4th at 328 (emphasis original).

Here, there is no evidence, much less evidence "sufficiently strong to command the unhesitating assent of every reasonable mind" that Prudential knew its coverage position was wrong and advanced it anyway (*i.e.*, malice) or that it somehow "oppressed" Mrs. Emerson by denying her insurance claim.  None of the legally independent experts Prudential consulted to evaluate Mrs. Emerson's claim believed she qualified for coverage under the Policy; there was nothing for Prudential to "ignore" when making its annual determination for her coverage to continue.

---

[8] Plaintiffs did not plead in their Complaint that Prudential committed any act of "fraud" entitling them to punitive damages.

Dentons US LLP
1999 Harrison Street, Suite 1210
Oakland, CA  94612
(415) 882-5000

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CA 94612
(415) 882-5000

1    Likewise, Plaintiffs have no evidence that a managing agent of Prudential committed any act

2 with "malice" or "oppression."[9]  "Managing agents" are "only those corporate employees who

3 exercise substantial independent authority and judgment in their corporate decisionmaking so that

4 their decisions ultimately determine corporate policy."  *White*, 21 Cal. 4th at 566-57.  No person

5 involved in Mrs. Emerson's claim had any discretion to "determine [Prudential's] corporate policy"

6 about anything.  Plaintiffs have no evidence that any Prudential employee involved in processing

7 Mrs. Emerson's claim was doing anything than handling her claim as they would any other, without

8 discretion to deviate from Prudential's standard practices.  There is no law that makes a claim

9 handling decision an exercise in deciding "corporate policy"; were it so, there would be no limit to

10 the types of decisions, or decisionmakers, that could risk punitive damages.  The California

11 Legislature made clear that only a specific class of persons, making specific kinds of decisions in

12 specific ways, could subject business entities to punitive damages.  Plaintiffs do not have anything

13 approaching sufficient evidence here.

14 **V.    CONCLUSION**

15    Prudential cannot have liability in this case as a result of it thoroughly investigating Mrs.

16 Emerson's LTC insurance claim, interpreting the Policy according to its plain language, relying on

17 outside experts to repeatedly review the claim, and ultimately requiring Mrs. Emerson to show that

18 she is entitled to coverage.  Nothing diminishes the unquestionable difficulties Mrs. Emerson has, but

19 Prudential cannot be made to pay on an insurance policy where coverage does not exist under the

20 policy and law.  Prudential is therefore entitled to judgment in this case.

21 Dated:  September 30, 2024                    DENTONS US LLP

22                                             By: */s/ Andrew Azarmi*
23                                                Andrew Azarmi
                                                Kelly R. Graf
24                                                Seena Forouzan
                                                Samuel D. Jubelirer
25                                                Alexander J. Padua

26                                                Attorneys for Defendant
27                                                THE PRUDENTIAL INSURANCE
                                                COMPANY OF AMERICA

28

---

[9] No Prudential officer or director was involved in this case at all.