UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRANK EMERSON and MARIA EMERSON, by her guardian ad litem, FRANK EMERSON

Plaintiffs,

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,

Defendant.

No. C 23-02158 WHA

**ORDER DENYING MOTIONS FOR REMOTE TESTIMONY**

In this insurance case, the insurer allegedly denied benefits in bad faith. Now, on the eve of trial, the insurer moves that remote testimony be allowed for (1) its director of the anti-fraud team who started the insured's claim review, and for (2) the former third-party claims manager who ended it. For reasons below, both motions are **DENIED**.

1. **STEPHEN DUBE, DIRECTOR, FRAUD, WASTE, AND ABUSE FOR LONG-TERM CARE, THE PRUDENTIAL INSURANCE COMPANY.**

    A.  *BACKGROUND TO THE MOTION.*

On October 7, 2024, counsel for parties attended our final pretrial conference (Dkt. No. 109). On October 11, 2024, a final pretrial order stated trial would be held starting November 12, 2024, and ending November 22, 2024 (Dkt. No. 115-1 ¶ 3).

Two days later, on October 13, 2024, Prudential's fraud, waste, and abuse director for long-term care policies, Stephen Dube, "unexpectedly suffered a severely painful left leg/knee injury which resulted in [him] attending the Emergency Room at [his] local hospital in Maine" (Dkt. No. 118-1 ¶ 3).

Over two weeks later, counsel for Prudential moved to let Dube testify remotely (Dkt. No. 116). Dube attested that physical therapy appointments for his "leg/knee" coincided with trial and that he could not travel (Dkt. No. 116-1 ¶ 3). The Court asked for more information as to "the compelling circumstances giving rise to the need," specifically "according to his physician," as well as to other factors supporting remote appearance (Dkt. No. 117 ¶¶ 2–3).

Five days later, and a week before trial, Prudential and Dube provided no doctor's note or further diagnosis for his "leg/knee injury" (Dkt. No. 118-1 ¶ 3). Dube did clarify three important points, as this order finds: *First*, physical therapy is not required: While not subtracting his prior, unattributed assertion that therapy is "required," Dube added an attributed statement that "my physician has *recommended* therapy" (compare *id.* ¶ 7, with *id.* ¶ 5). *Second*, Dube has scheduled appointments *only* on trial days, not other days: "It was difficult to get an appointment" for therapy (*ibid.*). As a result, "my first appointment is scheduled for November 12, the start of trial, and I have additional appointments scheduled for November 14, November 19, and November 21" (*id.* ¶ 4; *see also id.* Exh. 1). Trial ends November 22. *Third*, Dube can travel: While again not subtracting assertions that he was "unable" to travel, Dube adds more specific statements that "travel is not feasible" because "[a] layover is an additional physical burden as I w[ill] have to navigate the airport — potentially with limited time — on a crutch," among other such issues (*id.* ¶ 3).

### B. THE MOTION TO TESTIFY REMOTELY.

A party requesting that its witness testify remotely at trial must show "good cause in compelling circumstances and with appropriate safeguards" to overcome the "strong" preference that all trial testimony be in person. *In re Kirkland*, 75 F.4th 1030, 1043–45 (9th Cir. 2023) (quotation omitted). Our court of appeals has repeatedly explained: "The importance of presenting live testimony *in court* cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truth-telling." *Id.* at 1044 (emphasis original) (quoting FRCP 43(a) advisory committee's note to 1996 amendment ("n.1996")); *see also Draper v. Rosario*, 836 F.3d 1072, 1082 (9th Cir. 2016). These are not flimsy things. The district judge enjoys discretion to deny remote testimony *even if* parties

2

stipulate to it, and *even if* a witness is unable to testify in person. *See ibid.*; FRE 611. Indeed, the Ninth Circuit recently granted a writ of mandamus to quash orders to appear remotely at trial: It reasoned in part that "[t]he strong preference for in-person testimony would be greatly undermined" if such orders were routinely allowed. *See In re Kirkland*, 75 F.4th at 1044.

This order begins with a factor critical to these requests: The "importance of the testimony in the full context of the trial." *See* FRCP 43(a) n.1996; *see also* FRE 611(a). Here, Prudential concedes "Dube's testimony is important" (Dkt. No. 118 at 2). "Dube is the Director of the fraud, waste, and abuse program specific to Prudential's long-term care unit," and will testify to "why Mrs. Emerson's claim was tagged, how the designation was ultimately immaterial to the eligibility decision, and provides [*sic*] essential context for key claim moments" (*ibid.*). Among the critical moments involving Dube:

- Dube flagged Mrs. Emerson's claim for review (*see, e.g.*, Dube Dep. Tr. 85, 96–98; Dube MSJ Decl. ¶¶ 4–5);

- Dube participated in "weekly" calls between his anti-fraud team at Prudential and the third-party claims administrator, CHCS Services, Inc., about Mrs. Emerson's file and like files (*see* Gerrow Dep. Tr. 117; Bobeica Dep. Tr. 42–43; Sroczyk Dep. Tr. 56);

- Dube reviewed and approved the referral letters sent to the independent medical examiners for Mrs. Emerson's file, which lacked exact policy language regarding triggering conditions and which in one case included the request that doctors "please contact Stephen Dube directly at [his phone number]" (Dkt. No. 52-1 Exh. 75; *see, e.g.*, Dube Dep. Tr. 189–92; Dube MSJ Decl. ¶ 10);

- Dube hired and directly managed outside investigators to surveil Mrs. Emerson, then decided not to refer Mrs. Emerson's case to corporate-wide and government anti-fraud enforcers while continuing to order reviews of her file (*see* Dube MSJ Decl. ¶¶ 3, 6, 11; Dube Dep. Tr. 86–88; Dkt. No. 52-1 at Exh. 79);

- Dube requested, drafted, and/or reviewed multiple denial-of-claim letters, including the one he and his team sent to a nurse at CHCS before her final medical review of Mrs. Emerson's claim — asking that she "let [Dube and his team] know if [she] ha[d] any issues" — and which she delivered to Mrs. Emerson with only the date changed (*see* Dkt. No. 52-1 Exh. 70).

Dube's account of these events is important to this bad-faith denial case, yet his credibility even more so. Mrs. Emerson alleges that the costs of her claim pushed Dube and his team to torture their ordinary policy terms and claims processes until they produced a denial. Take the

3

investigation's starting point: Parties have evidence to establish what data points Dube used to tag Mrs. Emerson's file, and what he did next. But establishing whether those data points were designed to identify fraud or just high costs, and whether Dube structured the resulting process to deny her claim despite indicia it was valid, involves building up or breaking down Dube's credibility. Likewise, parties can show where referral letters tweak policy terms. What Dube's testimony provides is whether Prudential's account of those choices is credible.

Against those needs, there is not "good cause in compelling circumstances and with appropriate safeguards" to permit remote testimony. The Court gave Prudential ample time to produce information about Dube's "leg/knee." Prudential and Dube failed even to produce a diagnosis (*supra*). And, while the Court is doubtful that any safeguards could suffice where credibility is as crucial as it is here, Prudential failed to propose robust ones.

Prudential first asserts that one of the "most persuasive showings of good cause" is "when a witness is unable to attend trial for unexpected reasons, such as accident" (Dkt. No. 118 at 1 (citing authorities)). Prudential misses the point. It has not presented credible evidence, even when given a second chance, that its witness is "*unable*" to attend for "*unexpected*" reasons. Prudential plays dumb to the alternative account its declarations do not dispel: As Prudential grew concerned for its prospects at trial, it sought to turn a minor mishap (if any) into a massive lucky break. So, when Prudential's critical witness suffered a "left leg/knee injury" *two days* after the final pretrial order, and when he then scheduled his "recommended therapy" to coincide *exactly with the two weeks* of trial, Prudential at the very least pumped up the language in its request to try to prompt remote testimony and escape the crucible of live cross in the courtroom. Dube's second statement, however, reveals his condition is not so severe he is incapable of coming in person before our jurors.

Moreover, Prudential's conclusory statements about proposed safeguards do not assuage the concern that remote testimony on key points — where credibility is essential and cannot be reliably tested — could severely mislead the jury. In our pretrial conference, the Court explained the many ways it ensures credibility can be tested in the courtroom. For instance, when a "witness [is] on the ropes" during cross-examination, that witness stays on those ropes,

4

without unfair guidance, until cross concludes (*see ibid.*). "You will not save your witness by trying to cough or shuffle papers" (Tr. 66). Here, Prudential relies on cross as a safeguard, while making *no* effort to explain how on-site conduct during cross will be checked. Dube says he will "appear remotely to testify live at trial from my where I reside [*sic*] in Maine" (Dkt. No. 118-1 ¶ 9). Prudential says that Dube will be "visible on the screen, in good lighting, with no distracting audio," and that "Plaintiffs, for their part, can cross him as if he were live" (Dkt. No. 118 at 3). But what is to stop Prudential from having a supporting lawyer on Dube's side provide off-screen support to save their witness when he's on the ropes? Nothing Prudential proposed. And, in circumstances like these, perhaps nothing any party could propose. The Court lacks confidence that the opportunity to assess Dube's credibility could or would be adequately safeguarded anywhere except "*in court*."

The motion to permit remote testimony from party-witness and Prudential employee Stephen Dube (Dkt. Nos. 116, 118) is **DENIED.**

### 2.    JENNIFER JEFFORDS-MAZO, PRACTICING NURSE AND FORMER CLAIMS MANAGER, CHCS SERVICES, INC.

Prudential also moves that the third-party nurse and claims manager who denied Mrs. Emerson's claim be allowed to testify remotely, in this instance from Florida (Dkt. No. 119).

#### A.    BACKGROUND TO THE MOTION.

On October 7, 2024, at our pretrial conference Prudential floated that it would file a motion to permit remote testimony from a nurse in Florida having a hardship (Tr. 64–65). The Emersons then floated that they might do the same for a witness in New York (*id.* at 65). The Court's final pretrial order clarified that "[a]s to the one witness for each side who for extreme hardship reasons cannot appear live, the Court will consider and is likely to grant remote testimony" (Dkt. No. 115 ¶ 7(d)). But neither side filed its motion until prodded to do so by the Court. That prompt required that any motion give information about the import of any testimony, and any safeguards (Dkt. No. 117). The Emersons never filed a motion.

Prudential, a month after our conference and on the eve of trial, finally moves that the nurse in Florida, Jennifer Jeffords-Mazo, be permitted to testify remotely (Dkt. No. 119). She

is no longer employed by the third-party claims administrator, CHCS (Dkt. No. 119-1 ¶ 1). We are not told if she works for another third-party claims administrator serving Prudential. In any case, she works full-time from home while caring for her live-in 80-year-old mother, who needs help taking medications, sticking to her prescribed diet, and doing things at home (*id.* ¶ 4). Travel would cause Mazo to lose pay and vacation, and require her to "arrange and pay a caregiver to take care of my mother" (*id.* ¶ 5). She concludes: "I am unwilling to travel to California for a live trial. If I cannot testify remotely, I will not appear" (*id.* ¶ 7).

### B.    THE MOTION TO TESTIFY REMOTELY.

This order again begins with the "importance of the testimony in the full context of the trial." *See* FRCP 43(a) n.1996; *see* FRE 611. Prudential again concedes that Mazo's testimony is important (Dkt. No. 119 at 3). She "was the assigned license health care practitioner [who] reviewed Plaintiff Maria Emerson's file in the 2020–2021 claim period," and who determined Mrs. Emerson "did not have a chronic illness or disability" before then denying her claim (Dkt. No. 119-1 ¶ 2). Key moments her testimony might address include:

- when and how Mazo was assigned to manage Mrs. Emerson's claim review, and any instruction she received (*see* Mazo MSJ Decl. ¶ 5);

- what Mazo conveyed from Prudential staff to CHCS staff, including whether she told CHCS's medical director that Prudential's fraud team had flagged the file — particularly given Mazo is the only witness who says she discussed aspects of Mrs. Emerson's file with *both* Prudential's fraud team *and* CHCS's medical director (*see* Mazo MSJ Decl. ¶¶ 4–5);

- what Mazo chose to do next and why after receiving Dube's team's email stating: "[W]e have prepared the attached wording for a potential [denial letter for Mrs. Emerson]. Please advise if you are in agreement" (Dkt. No. 52-1 at Exh. 70);

- why Mazo denied Mrs. Emerson's claim, and whether it was indeed, as she says, "immaterial to my decision that Mrs. Emerson's claim was tagged as a priority matter [by Prudential], as I made my decision based on the medical file before me including the escalated doctor reviews" (Mazo MSJ Decl. ¶ 6).

Again, Mazo's account of these events is critical to this bad-faith denial case, yet her credibility more so. Parties have other evidence to establish Mazo denied the claim, and that she spoke with Prudential's fraud team. But her credibility is crucial as to whether she truly did not inform the CHCS medical director about Prudential's flag (and if so, why not) and whether while knowing about the flag herself she felt at liberty to approve the claim if valid.

6

Against those needs, there is no good cause to permit remote testimony. Mazo's concerns could have been anticipated months ago and plausibly ameliorated (or still can be). The costs of appearing, the hassle of arranging care for her mother, losing "hours" and/or "vacation" (*id.* ¶¶ 5–6): These are foreseeable logistics that might have required deposing her in Florida, but they do not merit accommodating remote testimony in this instance. *See* FRCP 43(a) n.1996. And, were such obstacles addressed, it would be strange indeed if Mazo continued to say: "If I cannot testify remotely, I will not appear" (*id.* ¶ 7).

And, that raises the next point, regarding safeguards: If Mazo's only remaining reason for not attending in person is that she prefers to face cross from the comfort of her home rather than from the crucible of the courtroom, that is not a reason to permit her to testify from home. Prudential's conclusory statements about safeguards again fail to meet the moment (*supra*).

The Court thus again exercises its discretion to reject remote testimony in this instance. The motion to permit remote testimony of Jennifer Jeffords-Mazo (Dkt. No. 119) is **DENIED**.

### CONCLUSION

In the Court's experience, remote testimony is an unsatisfactory means for assessing witness credibility. And, remote testimony complicates exhibits admission and overall courtroom mechanics. Our jurors' time will not be wasted just so they can be misled.

Prudential's motion to allow party-witness Stephen Dube to testify remotely (Dkt. Nos. 116, 118) is **DENIED**. Prudential's motion to allow third-party Jennifer Jeffords-Mazo to testify remotely (Dkt. No. 119) is **DENIED**. In-person testimony and deposition transcripts are alternatives. If parties did not take a deposition, that was their fault. The Court will not abide a botched fix that only compounds the problem.

**IT IS SO ORDERED.**

Dated: November 7, 2024.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

7